**Mark HAYES, Appellant,**

v.

**SECRETARY OF DEFENSE et al., Appellees.**

**No. 74–1360.**

United States Court of Appeals, District of Columbia Circuit.

Argued 27 Feb. 1975.

Decided 3 July 1975.

William J. Stevens, Chicago, Ill., for appellant. David A. Jones, Washington, D. C., also entered an appearance for appellant.

Jeffrey T. Demerath, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry and James F. McMullin, Asst. U. S. Attys., were on the brief for appellees.

Before RIVES,[*] Senior Circuit Judge, and McGOWAN and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

This appeal is taken from an order of the District Court, entered on 11 January 1974, which dismissed the appellant's petition for a writ of habeas corpus mandating his discharge from the United States Army.[1] The issues raised are (1) whether the appellant has adequately exhausted his administrative remedies within the Army and (2) whether appellant's enlistment contract was valid and binding.

## I. *Factual Background*

On 7 September 1972 appellant signed a three-year enlistment contract with the United States Army which provided for his eventual assignment to special intelligence duties with Army Career Group 97 (ACG 97). He had previously been approved for such enlistment by the Army's Office of Personnel Operations. Appellant also signed, however, prior to his enlistment, a "Contingency Statement" which acknowledged his understanding that final acceptance for duties with ACG 97 was "contingent upon a favorable background investigation, including an evaluation of my personal characteristics and potential capabilities . . .."[2] Moreover, the enlistment contract itself incorporated by reference a document entitled "Statements for Enlistment," which declared, *inter alia*:

I understand that my ultimate assignment to training and duty, and my retention in special intelligence duties will depend upon the following factors which cannot be determined prior to my enlistment:

. . . . .

(3) Favorable conclusion of a background investigation to include an evaluation of my potential and personal characteristics.

I understand that if found to be unqualified for retention in special intelligence duties for any of the reasons cited in this table, I will be so advised, my enlistment commitment will be voided, I will be reassigned in accordance with the needs of the Army, and I will be required to complete the period for which I enlisted.[3]

This declaration was signed and acknowledged by the appellant.

On 18 October 1972 the Office of Personnel Operations informed the appellant that he was not approved for special intelligence duties. The letter stated:

---

[*] Sitting by designation pursuant to 28 U.S.C. § 294(d).

[1.] No opinion was filed with the order of the District Court. The application for habeas corpus was originally filed in the Supreme Court with Justice William O. Douglas, pursuant to 28 U.S.C. § 2241(a). Citing 28 U.S.C. § 2241(b), Justice Douglas by memorandum opinion transferred the petition to the District Court on 26 October 1973. Ex parte Hayes, 414 U.S. 1327, 94 S.Ct. 23, 38 L.Ed.2d 200 (1973).

[2.] Pet. Exhibit C.

[3.] Govt. Exhibit A.

[T]he determination of nonacceptability for controlled intelligence MOS was based on an analysis of all available information, to include an evaluation of personal characteristics and potential capabilities. Consequently, he was considered *not as well qualified or as suitable in comparison to other applicants.* The nature of this determination is without prejudice and does not reflect on his loyalty or suitability to serve in other capacities in the US Army, nor does it reflect on his eligibility to qualify for a security clearance.[4]

On 3 November 1972 the appellant applied for immediate separation from the service under Army regulations providing for discharge of an enlisted man when an "enlistment commitment was . . . made but cannot be fulfilled."[5] Appellant's application was denied on 20 December 1972 by the Army Personnel Actions Office, on the ground that the Army's enlistment commitment had been expressly conditioned on a favorable background investigation, and that condition had not been met.[6]

On 16 January 1973 appellant wrote the Department of the Army requesting that he be informed of the nature of any negative data in his dossier responsible for his rejection from the ACG 97 program, "so that [he might] offer a rebuttal or explanation."[7]

In reply to his request, appellant was informed:

[T]he primary reason you were not accepted for Army Career Group 97 was that during your interview for enlistment you failed to truthfully answer the question concerning your employment turnovers.[8]

Specifically, the letter explained that although appellant had stated in his application that he had quit most of his jobs because they did not offer "future possibilities for advancement," in fact in at least three instances he was fired.

No further steps were taken by appellant prior to his filing of the petition for writ of habeas corpus in the Supreme Court on 14 September 1973,[9] some seven months later.

II. *Exhaustion of Administrative Remedies*

The chief contention of the Army in response to appellant's petition for writ of habeas corpus is that the action is premature. The Army observes that it is a "long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."[10] As explained recently by the Supreme Court:

The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies.[11]

According to the Army, appellant has failed to exhaust his remedies in two regards. First, he has made no attempt within regular administrative channels, through an application for reconsideration of the denial of discharge or otherwise, to explain or rebut the allegations which form the basis of the Department's unfavorable background report. Second, he has not presented his claim to

---

4. Pet. Exhibit D.

5. ¶ 5–32a(2). AR 635–200.

6. Pet. Exhibit I.

7. Govt. Exhibit B.

8. Govt. Exhibit C, dated 14 February 1973.

9. See note 1, *supra.*

10. Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). *See generally,* 3 K. Davis, Administrative Law Treatise, § 20.01 et seq. (Supp.1970); L. Jaffe, Judicial Control of Administrative Action, ch. 11 (1965).

11. Parisi v. Davidson, 405 U.S. 34, 37, 92 S.Ct. 815, 818, 31 L.Ed.2d 17 (1972).

the Army Board for Correction of Military Records.

### A. Exhaustion Within Administrative Channels

Appellant's response to the Army's first contention is that he exhausted his administrative remedy through regular channels when he applied for a discharge under Army rules governing unfulfilled enlistment commitments, and had his application denied. He could not explain or rebut the allegations relating to his employment turnovers because the Department initially failed to inform him of the factual basis for its decision. It was only after his application was rejected that he was apprised of the charge of dishonesty. In effect, appellant argues, "The respondents [appellees] would ask this Court to hold that Petitioner's [appellant's] attempt to pursue his administrative remedies was insufficient because they withheld relevant information from him during the course of processing his request." [12]

The Army, in rebuttal, admits that the 18 October 1972 letter to the appellant, while advising him that he was "not as well qualified" as the other applicants, failed to inform him of the exact factual foundation for the Department's conclusion.[13] It asserts, however, that this omission was born largely of a desire to protect the appellant from embarrassment and prejudice to his career. Evidence of its good faith is found in the fact that the Department promptly provided the appellant with the explicit reason for its decision when he so requested. At that point, the Army argues, if the appellant wanted to challenge the accuracy of the Department's findings, he had the right to reapply for a discharge and submit in support thereof "pertinent statements or documents which [would] assist in evaluating the service member's claim."[14]

Recognizing, however, that exhaustion is a doctrine of judicial administration which "must be applied in each case with an 'understanding of its purpose and of the particular administrative scheme involved,'"[15] the Army notes three reasons why application of the doctrine is appropriate here. First, if the appellant is required to present his factual claims to the Department for consideration, it will have an opportunity to develop the necessary factual background upon which judicial review can be based.[16] Second, and equally important, requiring exhaustion will afford the Army an opportunity "to discover and correct its own errors."[17] Judicial review may well become unnecessary if the appellant reapplies for a discharge on the basis of material facts previously unknown to the Department. Finally, in order to promote the integrity and effectiveness of the Army's administrative process, it is important that the judiciary refrain from taking cases such as this where an

---

12. Appellant Br. at 11.

13. See text accompanying note 4, *supra*.

14. ¶ 5–5c(6), AR 601–210. In fact, on 3 April 1975 the Chief of the Army's Personnel Actions Office, in response to a letter from appellant's counsel, observed that "this office is and has been willing to entertain a request for discharge based upon statements or other documents from these employers which rebut the allegations that your client was fired." Appendix Exhibit G.

15. Parisi v. Davidson, 405 U.S. 34, 37, 92 S.Ct. 815, 818, 31 L.Ed.2d 17 (1972), *quoting* McKart v. United States, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969).

16. *See* McKart v. United States, 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). The importance of this principle in the instant case is strikingly illustrated by appellant's argument before the District Court in connection with the question whether the Army had breached its enlistment commitment, that the Court should not consider the truth of appellant's statements in his enlistment interview— because that evidence was not part of the administrative record. Appellant Br. at 21. In view of the critical nature of the factual issue of the appellant's honesty, this absence of a record would appear precisely the reason why the trial judge considered application of the exhaustion doctrine appropriate in this case.

17. 395 U.S. at 195, 89 S.Ct. at 1663.

aggrieved party has by-passed the procedures which have been set up specifically to accommodate his claims.[18]

We find the Army's arguments persuasive. The appellant's position—that it was incumbent on the Army in the first instance to give him a meaningful explanation for its unfavorable decision, or forfeit its right to require him to challenge the decision through administrative channels—is not, however, without merit. Certainly, the phrase "not as well qualified or as suitable in comparison to other applicants" contained in the 18 October 1972 letter disapproving his special intelligence assignment was a poor choice of words for putting the appellant on notice that the Army considered him *unqualified* for the position.[19] Had the appellant requested a discharge at that point on the ground that under his enlistment contract a finding of non-qualification (as opposed to "lesser" qualification) was required to relieve the Army of its enlistment commitment—and had the Army failed in the face of that claim to reveal its evidence that he was absolutely, not just comparatively, unqualified—this would be a difficult case.

Appellant, however, was content simply to assert that he must be discharged because the Army had not placed him in a special intelligence unit. The only conclusion the Department could have drawn from appellant's application was that he claimed an *unconditional* right under his enlistment contract to be placed in the program of his choice.

This claim was defective on its face. Thus, there was no need for the Department to advert to the facts underlying its unfavorable background report in order to reject appellant's request for discharge.

It would appear, then, that both the Army and the appellant must share the blame for the failure of the original administrative proceedings to reach the crucial factual issues in this case. Had the Army initially made clear that it considered the appellant *unqualified* for special intelligence duties, he may have challenged the factual basis for that determination at the outset. At the same time, had the appellant made explicit his challenge to the legal sufficiency (for contract purposes) of the Army's statement that he was "not as well qualified," the Department almost certainly would have revealed the fact that it had actually found him "unqualified" in time for that issue to be joined in the original proceedings. Particularly in view of the Department's exculpatory motive for initially masking that finding, we do not think the Army can fairly be charged with dilatory tactics.[20]

A determination of the precise ground for the Army's unfavorable investigation of the appellant and the resolution of any factual disputes surrounding that investigation are central to a proper legal determination of the appellant's right to a discharge. They are issues which should be aired first in the regular course of the administrative process. Under appellant's view of the case, these issues would not be reached at all—in

---

18. *Ibid.*

19. That the Army at the time actually considered appellant *unqualified* for the special intelligence position is made clear in an affidavit from the Chief of the Intelligence Branch of the Office of Personnel Operations, which states in pertinent part:

> I regretted very much having to declare PVT Hayes nonacceptable because at the time this determination was made there existed a shortage of qualified personnel in the MOS for which he was eligible which storage has existed and continues to present.

Army Exhibit F.

20. We do think, however, that the Army should devise a more direct means of informing enlistees of the reasons for its decision not to assign them to the particular duties they requested, while still minimizing the adverse impact the decision might have on their future careers within the Army. In the instant case, the Department could have simply notified the appellant's Commander that the soldier had not been accepted for special intelligence duties, while advising the appellant that he could obtain the specific reasons for the determination upon request.

front of either an administrative or a judicial forum. As a corollary to his position that he adequately exhausted his administrative remedies when his request for discharge was denied, appellant argues that the Army can introduce no evidence before the District Court which was not made part of the "record" in the administrative proceeding.[21] As we noted above, however, responsibility for the failure of that proceeding to address the central issues in this case must be assumed by the appellant as well as by the Army. We are clear that the equities are not so imbalanced here as to justify cutting off inquiry into the true basis and factual validity of the Army's decision regarding the appellant's suitability for special intelligence duties.

We are aware that appellant's petition for habeas corpus is time-critical; further protracted litigation might well render it moot. Our conclusion that the case should be remanded to the Army for further proceedings, therefore, is influenced by the assurance we received from government counsel during oral argument that such proceedings could be completed within a month of the date of remand.

### B. Exhaustion Before the Board for Correction of Military Records

The Army's second contention under the exhaustion doctrine is that the appellant may not petition the District Court for habeas corpus relief—even after complying with the Army's discharge procedures and receiving its final (adverse) decision on the merits of his claim—without first having recourse to the Army Board for Correction of Military Records. Composed entirely of civilians, the Board is charged with determining whether a given military record reflects error or injustice and, if so, recommending its correction to the Secre-

tary of the Army. In Ogden v. Zuckert,[22] decided in 1961, this court found that the statute which created the Board[23] was not intended to affect judicial jurisdiction but simply to relieve Congress of the task of amending inaccurate or inequitable records by means of private bills.[24] We observed that the Board functioned wholly apart from the regular process by which the Army's administrative decisions were made:

> The Board furnishes a means by which to seek correction of error or injustice, but neither statute nor regulation requires this means to be pursued as a condition to finality of the Secretary's action. The relief which might ensue after Board consideration, similar to relief previously obtained by private bills enacted by Congress, is through a procedure over and above that which guides the administrative process itself to its end. It is a part of a different and subsequent procedure. The place and function of the Board may be roughly compared to that of the bill of review in equity which sought relief from a final judgment where error or injustice appeared.[25]

We held, therefore, that the exhaustion doctrine did not require dismissal of an Air Force officer's suit for a declaration that his medical disability discharge was invalid, even though he had not first petitioned the Air Force Board for Correction of Military Records. Instead, it was incumbent on the trial court to make the discretionary determination whether the suspension of the court's jurisdiction pending the officer's pursuit of relief before the Board was appropriate under the facts of the case.[26]

Five years after Ogden, in Sohm v. Fowler,[27] we were presented with the suit of a lieutenant commander in the United States Coast Guard seeking to

---

21. See note 16, supra.

22. 111 U.S.App.D.C. 398, 298 F.2d 312 (1961).

23. 10 U.S.C. § 1552 (1970).

24. 111 U.S.App.D.C. at 400–01, 298 F.2d at 314–15.

25. Id. at 401, 298 F.2d at 315.

26. Id. at 403, 298 F.2d at 317.

27. 124 U.S.App.D.C. 382, 365 F.2d 915 (1966).

enjoin and declare unlawful his forthcoming retirement. He had already petitioned the Board for Correction of Military Records to have his record corrected and had been granted a *de novo* hearing before that body. At that point, however, he abandoned his remedy before the Board in favor of an action in District Court. The court, relying on *Ogden*, exercised its discretion by holding that the appellant need not exhaust his pending remedy in front of the Board. Reaching the merits of the plaintiff's case, the court granted summary judgment in favor of the defendant Secretary of the Treasury.

We found on appeal that the District Court's exercise of jurisdiction was an abuse of discretion. In view of the fact that plaintiff had already affirmatively and successfully invoked the jurisdiction of the Board:

> Holding this suit in abeyance until the Board completes its action would comply with the basic policy of the law that administrative remedies should be exhausted so long as the agency clearly has jurisdiction over the case and so long as resort to the agency is not obviously futile. This policy, although subject to the exercise of discretion, has been applied by numerous courts in the context of Boards for Correction of Military Records, and it has evolved to the point where it can be formulated as a rule that the administrative remedy should be exhausted unless the party invoking the court's jurisdiction can demonstrate special circumstances.[28]

■ The narrow holding of the case is unexceptional: once invoked, an administrative remedy should be carried to its conclusion unless such process appears to be futile. The integrity of the process requires no less. However, the broad language of some parts of the opinion in *Sohn*, implying that generally an application to the Board is a necessary prerequisite to federal judicial review, seems at odds with this court's position in *Ogden*.[29] Were the instant case one, like *Ogden* and *Sohm*, where the plaintiff was endeavoring to *prevent* his discharge from the military, we might be obliged to resolve this apparent conflict.[30] Appellant here, however, seeks to *obtain* a discharge from his confinement within the Army.[31] The delay attendant upon a

---

**28.** *Id.* at 384–85, 365 F.2d at 917–18.

**29.** *See* Turner v. Callaway, 371 F.Supp. 188 (D.D.C.1974).

**30.** As a rule the various Boards for Correction of Military Records have primarily concerned themselves with post-discharge applications for corrective relief. *See* Nelson v. Miller, 373 F.2d 474, 479 (3d Cir.), cert. denied, 387 U.S. 924, 87 S.Ct. 2042, 18 L.Ed.2d 980 (1967). In most cases, where a party seeking to remain in the military is required to exhaust his remedy before the appropriate Board, post-discharge review is capable of granting the party full retroactive restoration. *See, e. g.,* McCurdy v. Zuckert, 359 F.2d 491 (5th Cir. 1966). It is rare that the interval between discharge and Board action harbors a potential for irreparable harm. And when such potential is shown, it is often possible to obtain a stay of discharge pending review by the Board. *See, e. g.,* Schwartz v. Covington, 341 F.2d 537 (9th Cir. 1965).

**31.** In recent years, the majority of cases reaching the federal courts in which a party has sought a discharge from the Army have involved conscientious objectors. The Second, Fourth, and Fifth Circuits have held that an unsuccessful applicant for post-induction conscientious objector discharge does not have to appeal to the Board for Correction of Military Records in order to exhaust his administrative remedies. *See* Pitcher v. Laird, 421 F.2d 1272 (5th Cir. 1970), and cases cited therein. (The contrary determination of the Ninth Circuit in Craycroft v. Ferrall, 408 F.2d 587 (1969), was vacated by the Supreme Court when it was advised that the Justice Department had decided to acquiesce in the proposition that the doctrine of exhaustion does not require, in the case of conscientious objectors, application to a Board. 397 U.S. 335, 90 S.Ct. 1152, 25 L.Ed.2d 351 (1970). *See* Parisi v. Davidson, 405 U.S. 34, 38 n. 3, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972).) Authority also exists outside the field of conscientious objection for the proposition that exhaustion before the Board is not required when a discharge from the Army is sought. *See* Williams v. Froehlke, 356 F.Supp. 591 (S.D.N.Y.1973); United States ex rel. Joy

petition to the Board for Correction of Military Records would significantly increase the length of his involuntary service without judicial review.[32] Indeed, appellant's case would likely be mooted altogether.[33] In such a situation, where time is of the essence, strong justification must be found to require resort to an administrative remedy over and above the regular discharge procedure. We find no such justification here.

We hold, therefore, that once having exhausted his administrative remedy through the chain of command, the appellant may seek relief in the District Court from an adverse decision without first petitioning the Army Board for Correction of Military Records.

### III. *Validity of the Enlistment Contract*

Appellant's challenge to the validity of his enlistment contract is based primarily upon his contention that the Army did not find him "unqualified" for special intelligence duties. Rather, he was found only "less qualified" than other candidates. Since a showing of absolute non-qualification was required under the contract and under applicable regulations to relieve the Army of its enlistment commitment, appellant argues, the Department's refusal to assign him to duties with ACG 97 breached the contract.

 We have already detailed the reasons why the Army should not be bound in this case to its original characterization of the appellant as "not as well qualified or as suitable in comparison with other applicants." Presently, the Department takes the position that the appellant was revealed by its background investigation to be unfit for special intelligence work. This posture is legally sufficient to satisfy the Department's contractual commitment. Whether the investigatory determination was factually valid is a question we leave for the remand in this case.[34]

### IV. *Conclusion*

 As the question of exhaustion of administrative remedies is one addressed not to the jurisdiction of the trial court but to its judicial discretion, in appropriate cases the court may assume and retain jurisdiction over an action pending its remand to the administrative agency.[35] In view of the speed with which we are told the Army will process a reapplication for discharge by the appellant—should he choose to make one—we think retention of jurisdiction by the District Court is appropriate here. We therefore reverse the court's dismissal of this case with instructions to suspend consideration of the action pending a remand to the Army for further proceedings.

So ordered.

v. Resor, 342 F.Supp. 70 (D.Vt.1972). It seems clear that a major reason for the decision of the courts to exercise jurisdiction in this area is the fact that habeas corpus affords a much speedier remedy to the individual involuntarily serving in the Army than can a petition to a Board for Correction of Military Records. *See* United States ex rel. Brooks v. Clifford, 412 F.2d 1137, 1141 (4th Cir. 1969).

**32.** The Government represented before the District Court that proceedings before the Army Board for Correction of Military Records could take as long as five months. Tr. 27.

**33.** Appellant's enlistment apparently terminates on 7 September 1975.

**34.** We find without merit appellant's arguments (1) that he was improperly induced into signing the enlistment contract by the Army's letter of 10 August 1972 provisionally clearing him for duties with ACG 97 and (2) that he was not put on notice that if he failed to qualify for his desired assignment he would be required to complete his commitment.

**35.** *See* Ogden v. Zuckert, 111 U.S.App.D.C. 398, 403, 298 F.2d 312, 317 (1961), and cases cited therein.